# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 18, 2013

## STATE OF TENNESSEE v. ANDRES ANDRES FRANCISCO

**Direct Appeal from the Criminal Court for Knox County**
**No. 98780     Bob R. McGee, Judge**

**No. E2013-00360-CCA-R3-CD - Filed June 5, 2014**

A Knox County Criminal Court Jury convicted the appellant, Andres Andres Francisco, of one count of attempted aggravated sexual battery and three counts of rape of a child. Following his convictions, the trial court imposed a total effective sentence of fifty years in the Tennessee Department of Correction. On appeal, the appellant contends that the evidence was not sufficient to sustain his convictions; that the trial court erred in denying his motions to suppress DNA evidence and his statement to police; and that the trial court erred by imposing consecutive sentencing. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Mark E. Stephens (on appeal), Jessica Greene (on appeal and at trial), and Robert Edwards (at trial), Knoxville, Tennessee, for the appellant, Andres Andres Francisco.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Randall E. Nichols, District Attorney General; and Charme Knight, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Factual Background

At trial, the victim, whose birthday was May 10, 1998, testified that she had one younger brother and two younger sisters. The appellant, her mother's cousin, had lived with her family for approximately four years. The victim's mother did not want the appellant to live with them, but the victim's father insisted because the appellant was a relative.

The victim said that in the fall of 2010, she was twelve years old and in the seventh grade. Her mother worked at night, and her father did landscaping work during the day. The appellant also did landscaping. Not long after her brother's birthday party on September 25, 2010, the victim was in the living room doing her homework. She was wearing a tank top because of the hot weather. The appellant came into the room, grabbed her hand, pulled her tank top "half way" down, and tried to touch her breasts. The appellant stopped when the victim threw a pencil at his forehead. In response to the State's question regarding how close the appellant's hands were to her breast, the victim responded, "It was like right here[1] and I [threw] that pencil at him."

The victim said that two or three weeks later, the appellant was at home when she and her siblings returned from school. The victim wanted to take a shower because it was hot outside, but her brother got into the shower first. While she waited in her room for her turn to bathe, she took off her shirt and wrapped a towel around herself. The appellant sneaked up behind her, removed the towel, put it over her face, and pulled her pants down. He pushed her to the floor then penetrated her vagina with his penis.

The victim said that on another occasion, her parents went to the store, and she and her siblings stayed home with the appellant. While she was cleaning her mother's bedroom, the appellant came into the room, approached her, and grabbed her head with one hand. With his other hand, he removed his penis from his pants and tried to make her perform oral sex on him. She said that his penis touched her lips but did not penetrate her mouth. The victim found a pencil and tried to stab the appellant, but she missed.

The victim said that sometime around her sister's birthday on November 17, 2010, her parents were working, and she was at home with her siblings and the appellant. The victim was in her room, wearing a long shirt and basketball shorts. The appellant came into the room and pushed her onto the bed; she landed on her back. The appellant grabbed a blanket and put it over her face. He pulled her shorts down, unzipped his pants, and penetrated her vagina with his penis.

The victim stated that the last time the appellant assaulted her, her sisters were at home, but her father and brother were at boxing practice. The victim and one of her sisters

---

[1]The record does not reflect the distance to which the victim was referring.

were in her bedroom, sitting on the bed and playing a game. Her bedroom door was closed and locked. The appellant unlocked the door, came into the room, and told her sister to check on the other sister. The victim started to follow as her sister left the room, but the appellant grabbed her hand. He pushed the victim onto the bed, and she landed on her back. The appellant took a blue blanket from the bed and put it over her face. She tried to fight him, but he had his hands on her arms. The appellant took one hand off the victim and pulled down his pants. He pulled the victim's sweatpants "[h]alf the way down" and penetrated her vagina with his penis. The victim said that it felt "weird" and that it "hurt[]." She tried to scream for her sisters, but the blanket muffled her cries. The appellant ran to his room when he heard the victim's cousin come into the house five minutes later. The victim noticed that the bed was wet. The victim thought the assault happened in December 2010, recalling that her family had bought Christmas presents and decorations. Shortly after this incident, the appellant moved out of the house.

The victim said that her last menstrual cycle was in November 2010. In June 2011, her father took her to a doctor, and they learned that the victim was pregnant. The victim told her father that the appellant had molested her, and her father called the police.

The victim said that she delivered a baby boy by Caesearean section on August 17, 2011. Investigator Clemons came to the hospital and took buccal swabs from the victim and the baby.

On cross-examination, the victim said that her home had three bedrooms. From September to December 2010, the victim's mother, father, and sisters shared one bedroom. The victim shared a bedroom with her brother, and the appellant had his own bedroom.

The victim acknowledged that when she was in middle school, a teacher spoke with the students about "good touching versus bad touching." Nevertheless, she did not immediately reveal that the appellant had molested her. After the victim and her father learned that she was pregnant, they went home for a "family gathering," and her father confronted the appellant. When the confrontation became heated, the victim's father called 911. During the call, he asked the victim to speak with the operator because he had trouble communicating in English. The 911 operator asked the victim who impregnated her, but the victim did not respond. Sometime later, during her initial conversation with Investigator Clemons and Mr. Morisett, the victim told them that the appellant had molested her at least six times, but she disclosed the details of only two of the incidents.

Regarding the incident when the appellant attempted to touch her breast, the victim asserted that he was unsuccessful because she stabbed him with a pencil.

On redirect examination, the victim said that she did not immediately reveal the abuse because the appellant threatened to hurt her family. Additionally, following the last incident, the appellant told her that his wife "knew witchcraft," and he threatened to send the victim's photograph to his wife to "put [the victim] in witchcraft." The victim believed the appellant would follow through on his threats and do "something bad" to her or her family.

On recross examination, the victim acknowledged that she did not tell Investigator Clemons and Mr. Morisett that the appellant had threatened her with witchcraft. She explained that she knew what "witchcraft" meant in Spanish but did not know what it meant in English.

Knoxville Police Investigator Shelly Clemons testified that she spoke with the victim before she spoke with the appellant. She said that he gave "conflicting birth dates," all of which were "indicative of him being over 18 years of age." During the meeting, Danielle Weiber, with the Knoxville Police Department's forensic unit, collected buccal swabs from the appellant. Thereafter, Russ Whitfield, who was also with the forensic unit, collected buccal swabs from the victim and her baby. Investigator Clemons requested that the swabs be sent for testing to determine the baby's paternity.

Dwayne Winston, an employee of LabCorp in North Carolina, testified that he tested the buccal swabs and that he could not exclude the appellant as the father of the victim's baby. He stated that "[t]he probability of paternity is 99.99% that [the appellant] is the biological father opposed to a random male in the . . . Hispanic population."

After the State rested its case-in-chief, defense counsel moved for a judgment of acquittal on count five, which charged the appellant with digitally penetrating the victim. Without objection from the State, the trial court granted the motion.

The appellant, who was the sole defense witness, testified that he was originally from Guatemala and that his wife and four children still lived there. The appellant's "first language" was Acateco, "a dialect from the region of San Miguel"; Spanish was his "second language."[2] The appellant said that when he was seven years old, he began attending school. His family was poor, and after one year, he left school and started working. The appellant thought he came to Florida from Guatemala in 2005, but he was not certain of the year. In 2008, he came to Knoxville to stay with the victim's mother.

The appellant acknowledged that he had his own room at the victim's residence, and he maintained that he "got along very well" with the victim's family. The appellant worked

---

[2]The appellant testified through a Spanish interpreter.

-4-

as a landscaper, occasionally working with the victim's father. He said that on December 21, 2010, he returned to Guatemala. He came back to Tennessee in May 2011 and lived with his brother and sister-in-law.

The appellant said that approximately one month after he returned to Tennessee, he was confronted by the victim's father. The victim's father was upset and told the appellant to remove his belongings from the victim's home. The appellant went to the victim's residence with the victim's father. When they arrived, the victim's mother started crying and asked, "'Cousin, why did you do this to me? Why did you do this to my girl?'" The appellant replied that he had not done anything, asserting, "I'm not an animal." The appellant told them that he would not have returned to the United States if he had done anything wrong. The appellant asked the victim, "'Why didn't you tell it right away? I mean, why are you just starting saying those things?'" During the conversation, the victim's father called 911, then he handed the telephone to the victim. The appellant said that the victim's accusations made him feel bad because the victim was his cousin's daughter.

The appellant said that around 4:00 p.m., after the 911 call, the police came to the house. They arrested him and took him to the police station. After one or two hours, he spoke with Investigator Clemons and an interpreter. The appellant said that he was wearing "thin clothes" and that the room they were in was "really cold." He said that the interview lasted a long time. The appellant denied molesting the victim. During the interview, the appellant revealed that on one occasion in May 2010, he drank four or five beers at the residence. Afterward, he lay down on his bed to listen to music. The victim and her sister came into his room, asked what he was doing, and accused him of being drunk. There was no seating in the room, so the victim sat on the bed beside the appellant's legs. The appellant said, "And then she started pulling my zipper down. And I asked her, 'What are you doing there? You're dirty. You – you cannot do that. I'm going to tell your dad.'" The appellant said that the victim stopped and apologized.

The appellant denied having sex with the victim, attempting to touch her breasts, or threatening her. The appellant also denied that his wife was involved in witchcraft, asserting that they were Catholic. The appellant denied fathering the victim's child, maintaining that the DNA test results could be explained because they had "a common grandfather."

On cross-examination, the appellant said that he lived with the victim's family for two years, including the period between September and December 2010.

The jury found the appellant guilty of one count of attempted aggravated sexual battery and three counts of rape of a child. The trial court imposed a total effective sentence of fifty years. On appeal, the appellant contends that the evidence was not sufficient to

sustain his convictions; that the trial court erred in denying his motions to suppress DNA evidence and his statement to police; and that the trial court erred in sentencing.

## II. Analysis

### A. Motions to Suppress

The appellant contends that the trial court erred by denying his motions to suppress the DNA test results and his statement to the police.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

### 1. DNA Evidence

The appellant contends that the trial court erred by admitting the DNA test results establishing the paternity of the victim's baby. The appellant maintains that although he consented to the police's collection of a buccal swab, the consent was not "knowingly and intelligently" given.

At a pretrial motion hearing, defense counsel acknowledged that before the DNA evidence was collected, the appellant was advised of his Miranda rights, that he waived those rights, and that he consented to the collection of a buccal swab. Defense counsel alleged, however, that the appellant's consent was not "knowingly and intelligently" given because the police did not tell the appellant that the buccal swab would be used for DNA testing. The State asserted that in order for the consent to be valid, it was not required to "go into how DNA works."

-6-

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). Our supreme court has noted that, "[i]t is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." Jackson, 889 S.W.2d at 221. The prosecution bears the burden of proving that the appellant freely and voluntarily gave consent. See State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). We further observe that "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting McMahan, 650 S.W.2d at 386). Our supreme court has stated that the following factors are to be considered in evaluating the voluntariness of consent:

> "1. Time and place of the encounter;
>
> 2. Whether the encounter was in a public or secluded place;
>
> 3. The number of officers present;
>
> 4. The degree of hostility;
>
> 5. Whether weapons were displayed;
>
> 6. Whether consent was requested; and
>
> 7. Whether the consenter initiated contact with the police."

State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005) (quoting 79 C.J.S. Searches and Seizures § 119(b) (1995 & Supp. 2004)).

On appeal, the appellant acknowledges that he consented to the collection of a buccal swab. However, he contends that he was not told the swab would be used for DNA testing; therefore, his consent was not "knowingly and intelligently" given. Regarding this claim, he notes that he had a limited education, he was unfamiliar with English, and Spanish was his second language. He contends that his misstatement of his age as twenty-seven or twenty-eight when he was only twenty-three years old indicates his "complete lack of sophistication." The appellant also contends that the police coerced him into giving consent

-7-

by keeping him "at the police station for ten and a half hours" and "yell[ing] at him, t[elling] him that he needed to be a man, [and] needed to fess up."

The trial court found that the appellant understood his rights and that he knowingly and voluntarily waived his rights. We agree with the trial court. The transcript of the appellant's interview reflects that although the appellant said he was twenty-seven or twenty-eight years old, he also said that he did not "really know" his correct age. The transcript further reflects that shortly after the appellant was advised of his Miranda rights, he consented to the collection of the buccal swab. Further, at the suppression hearing, Officer Ferro, who acted as the Spanish interpreter for the interview, testified that he advised the appellant of his Miranda rights, that the appellant appeared to understand his rights, and that the appellant waived his rights. The appellant did not testify at the suppression hearing, and, at trial, he did not claim he did not understand that he was giving his consent to DNA testing. To the contrary, he testified that he told the police, "'I didn't do it.' And then I said, 'I – I want to have a test done.' Because I asked for that test because I knew that I didn't do it." We conclude that the evidence does not preponderate against the trial court's ruling that the appellant voluntarily consented to the collection of a buccal swab for the purpose of DNA testing.

## 2. Statement to Police

The appellant contends that the trial court erred by finding that his statement to police was admissible. Specifically, he contends that he did not knowingly and voluntarily waive his Miranda rights. Additionally, the appellant contends that the admission of his statement, which revealed that he had "sexual contact with the alleged victim outside the indictment date," violated Tennessee Rule of Evidence 404(b).

At the hearing on the motion, defense counsel stated that the appellant was taken from the victim's home at 5:00 p.m., that he was transported to the police station, that the interrogation began at 10:00 p.m., and that the questioning lasted about four hours. Defense counsel said, "I believe they asked for DNA around minute 25, so he'd already been at the police station for just shy of five and a half hours of that time." Defense counsel further contended that the appellant had a limited education and that the officers questioned him in Spanish, which was his second language. Defense counsel contended that the appellant "barely reads and writes Spanish if at all."

Knoxville Police Officer Nicholas Ferro testified that he had worked as a Spanish translator for the police department approximately 200 times. In the instant case, Investigator Clemons requested that Officer Ferro translate during her questioning of the appellant. Officer Ferro read the appellant an advice of rights form, which apprised him of his Miranda

rights. Officer Ferro said that the appellant had no questions, did not seem confused, and waived his rights. The appellant placed his initials on the form after each provision was read to him. Specifically, two of the provisions asked whether the appellant understood his rights and whether the appellant wanted to make a statement. Following those provisions, the appellant wrote "sí," the Spanish word for "yes." Additionally, the appellant signed and dated the advice of rights form. The appellant did not ask for an attorney or request that the questioning cease.

On cross-examination, Officer Ferro said that when he asked the appellant his age, the appellant responded that he was twenty-seven or twenty-eight years old and that he was born in 1983. When Officer Ferro asked whether the appellant understood why he was at the police station, the appellant replied that he did not. The appellant told Officer Ferro that his sister's name was Magdalena, but he could not spell her name. The appellant told Officer Ferro that he could not write in Spanish and therefore was unable to write his statement.

At the request of defense counsel, the trial court agreed to read the transcript of the interview prior to ruling on the issue.

The parties stipulated that the appellant denied the allegations of sexual abuse for approximately four hours; however, near the end of the interview, he acknowledged that he had a sexual encounter with the victim in May 2010. The State conceded that the indictment did not allege that any abuse occurred in May 2010. Nevertheless, the State argued that the act occurred between September and December 2010, the time frame alleged in the indictment, and that the appellant was confused about the month in which the act occurred. Defense counsel responded that the State's argument was "absurd," contending that the appellant was not confused about the month and that he clearly knew the time frame to which he was referring. The court said, "At this point I'm certainly inclined to allow his admissions – his admission that he had sexual contact or sexual activity with the victim. Unless [defense counsel] win[s] on the Miranda issue."

Defense counsel continued to argue, maintaining that pursuant to State v. Rickman, 876 S.W.2d 824 (Tenn. 1994), the trial court was obligated to exclude the portion of the statement admitting sexual contact with the victim in May 2010. The State asserted:

> My victim says everything happened in the fall. [The appellant] says it happened in May. Our argument is they're talking about the same sexual encounter. But we're talking about a man – if we want to go with what they've argued earlier, who doesn't even know how old he is. He doesn't know how many years he's been on this earth, so I would argue that if

-9-

they're arguing he doesn't even – he's not smart enough to know how many years he's been on the earth, he's clearly confused between May and November.

The trial court stated that initially it had believed the appellant was referring to an incident that occurred within the time frame of the indictment. However, after discerning that the appellant "did not acknowledge . . . sexual activity within the timeframe [sic] of the indictment," the court held that the appellant's acknowledgment of a sexual act was admissible but that the date should be excluded.

We note that on the day of trial, the State provided appellant a redacted statement in compliance with the trial court's ruling at the suppression hearing. However, the State did not introduce the appellant's statement at trial, and the contents of the statement were not mentioned by the State in its case-in-chief. At the motion for new trial hearing, the State explained that it chose not to use the statement because of the uncertainty regarding the date of the incident. Instead, the appellant testified about the statement during his direct examination, alleging that the encounter he acknowledged occurred in May. According to the appellant, the victim tried to pull his zipper down and he stopped her. Thus, the appellant asserted that the victim, not the appellant, initiated the acts in question and that he was completely innocent of all wrongdoing.

The appellant contends that the trial court should have followed the dictates of Rule 404(b) and Rickman and suppressed the statement. He further contends that because the trial court did not suppress the statement, he was forced to make a tactical decision to introduce the statement first.

Tennessee Rule of Evidence 404 provides:

(b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon

-10-

request state on the record the material issue, the ruling, and the
reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act
to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is
outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, Rule 404(b) is a rule of exclusion. State v. Jones, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999). However, certain exceptions exist, such as when the other crime, wrong, or act "is relevant to an issue other than the accused's character such as identity, motive, common scheme or plan, intent, or absence of mistake." State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

In State v. Rickman, 876 S.W.2d 824, 829 (Tenn. 1994), our supreme court carved out a special exception, which allowed the admission of "evidence of other sex crimes [between a defendant and his victim] when an indictment is not time specific and when the evidence relates to sex crimes that allegedly occurred during the time as charged in the indictment." However, the Rickman court "expressly declined to establish a 'sex crimes exception' to the general rule that evidence of uncharged crimes is inadmissible [and instead] upheld the general rule, excluding evidence of other crimes or bad acts as irrelevant and prejudicial." McCary, 119 S.W.3d at 243-44.

In the instant case, the trial court ultimately decided that the appellant's statement regarding prior contact with the victim did not fall within the time frame of the indictment; accordingly, the conduct was not admissible under the Rickman exception. The record reveals that the trial court failed to properly perform the Rule 404(b) analysis regarding the prior conduct. Nevertheless, the State did not introduce proof of the conduct during its case-in-chief. Instead, the appellant made a tactical decision to introduce proof of the conduct. Accordingly, we conclude that he is not entitled to relief on this issue. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be

-11-

granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

## B. Sufficiency of the Evidence

The appellant complains that the evidence was insufficient to sustain his convictions of attempted aggravated sexual battery and three counts of rape of a child. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Regarding count one, the appellant was convicted of attempted aggravated sexual battery based upon his attempt to touch the victim's breasts. Aggravated sexual battery as it applies to this case is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [and] . . . [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

The appellant complains that the victim's "testimony only set forth a very vague, general, non-specific description of the alleged act." We disagree. The victim, who was twelve years old at the time of the offense, testified that the appellant pulled her tank top down "half way" and tried to remove the top completely. The appellant attempted to grab her breast and was thwarted only when the victim "stabbed" him with a pencil. This testimony is sufficient to sustain the appellant's conviction for attempted aggravated sexual battery.

Rape of a child is the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). Our supreme court has defined fellatio as "a sex act accomplished with the male sex organ and the mouth of another[, however,] intrusion into the victim's mouth is not required." State v. Marcum, 109 S.W.3d 300, 304 (Tenn. 2003) (citing Tenn. Pattern Jury Inst.-Crim 10.06); see also State v. Daniel Pottebaum, No. M2007-02108-CCA-R3-CD, 2008 WL 5397848, at *15 (Tenn. Crim. App. at Nashville, Dec. 30, 2008).

At trial, the victim testified that on one occasion between September and December 2010, the appellant grabbed her head, pulled it toward his penis, then touched and rubbed her lips with his penis. These actions were the basis for the appellant's conviction on count two. On another occasion, around October 2010, the victim was preparing to take a shower, and

she had a towel wrapped around her. The appellant came into the room, pulled the towel away, shoved the victim backward onto the bed, placed the towel over her head, removed her pants, and penetrated her vagina with his penis. These actions were the basis for the appellant's conviction in count three. Regarding count four, the victim testified that in December 2010, the victim was in her mother's bedroom when the appellant walked in, pulled her to the bed, put a blanket over her head, held her hands down, pulled her pants down, and penetrated her vagina with his penis. The victim said that her last menstrual period was in November 2010. In August 2011, the victim had a baby, and DNA testing revealed that the appellant was the child's father.

The appellant complains that "but for" the evidence that was admitted pursuant to the trial court's erroneous rulings on his motions to suppress, "it would have been the [victim's] word versus the [a]ppellant's word." In other words, the appellant contends that without the DNA evidence and his statement to police, the jury would have determined that his testimony was more credible than the victim's testimony. As we concluded previously, the trial court did not err in admitting the challenged evidence. We conclude that the evidence was sufficient to sustain the appellant's convictions for rape of a child.

C. Sentencing

Finally, the appellant complains that the trial court erred by imposing consecutive sentencing, resulting in a total effective sentence of fifty years.

At the sentencing hearing, the State introduced the appellant's presentence report. The report reflected that the appellant was convicted of driving under the influence (DUI) on December 22, 2011, and that he received probation. Thereafter, his probation was revoked on October 13, 2011. The appellant was then deported, but he later returned to the United States illegally. The State also introduced the appellant's psychosexual evaluation, which reflected that the appellant "took no responsibility for his behavior," that the appellant's "level of dangerousness cannot really be predicted from the information gathered in this assessment," and that the testers did "not believe[] that [the appellant] was honest in his account of the offense." The evaluation further reflected that despite the paternity test revealing that he was the father of the victim's child, he nevertheless "denied any sexual activity with the victim."

The victim's father testified that the appellant

> has destroyed the whole life of my daughter. He destroyed her
> complete life. She is my firstborn daughter. I trusted him. He's
> a member of my family. He is my wife's cousin.

I – I – I am totally destroyed. I'm constantly thinking day and night of my daughter. I want him to have a lifelong sentence. I don't want him to be released here. If – if – if he gets released here in the United States, he will come back to the United States. In my – I don't want to see him ever again in my life. That's all I wanted to say. That's it.

Thereafter, the appellant made the following allocution:

I just want to say I didn't do it. And she is my cousin's daughter, and I don't know why she's naming me. And I know that I didn't do any harm on her, and that's why I came to this country. Because – because if I would have done it, I wouldn't have come back to this country. I know I would have gone to jail.

Why did I come to this country?

Because I have children. I have four children. I have family and I have four children. And I had three children, and my wife, she – when I came here she was pregnant, and that's the whole little child that I have. And – and that's why I have to go back to my country. That's why my wife sen[t] the judge a letter because my children are suffering and I have to be with them.

And – and I don't know what's going to happen to me, but I want my children to have studies because my father was poor and I couldn't have any studies.

Defense counsel argued that the appellant was a young man, that he had a good work history, and that he was responsible for supporting his children.

The trial court sentenced the appellant to twenty-five years for each rape of a child conviction. See Tenn. Code Ann. § 39-13-522(b)(2)(A). Additionally, the court sentenced the appellant as a standard, Range I offender to three years for the attempted aggravated sexual battery conviction, the minimum sentence for that offense. See Tenn. Code Ann. §§ 39-13-504(a)(4); 39-12-107(a); 40-35-112(a)(3). The court ordered that the sentence for rape of a child on count three be served consecutively to the sentence for rape of a child on count

two with the remaining sentences to be served concurrently, for a total effective sentence of fifty years. See Tenn. Code Ann. § 40-35-115(b)(5).

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Additionally, our supreme court has held "that the appropriate standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." State v. James Allen Pollard, __ S.W.3d __, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *7 (Tenn. at Nashville, Dec. 20, 2013). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant does not challenge the length of the individual sentences imposed by the trial court. Instead, he challenges the imposition of consecutive sentencing. Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

In the instant case, the trial court imposed consecutive sentencing upon finding that the appellant was

> convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the [appellant] and victim or victims, the time span of [appellant's] undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

Tenn. Code Ann. § 40-35-115(b)(5).

The appellant contends that he was not one of the victim's caregivers; therefore, he did not have a close relationship to exploit in order to molest the victim. Further, he asserts that "this particular case is not as grievous as instances where children are abused for a period of years or even a period of a year." Additionally, the appellant contends that the acts for which he was convicted were "not as grievous as those committed against smaller children. Nor are they particularly deviant sex acts, as they do not consist of fetishistic or unusual sexual behavior." The appellant also states that there was no proof of any "residual, physical and mental damage to the victim." The appellant contends, therefore, that the trial court erred by imposing consecutive sentencing.

The proof at trial and at the sentencing hearing revealed that the victim's family allowed the appellant to live with them because he and the victim's mother were cousins. The victim's father stated that he had trusted the appellant because he was family. Testimony revealed that the victim and her siblings were left in the appellant's care while her parents were shopping or working. The molestation took place in the victim's home when her parents were not there. Accordingly, the familial relationship gave the appellant access to the victim. The trial court found that "there's no question that this was a familial relationship, one involving trust. And the fact that they were family and had – had close – close interactions with each other highlights the importance of the trust that should have been safely taken with regard to the [appellant]." The court noted that the victim's family accepted the appellant into their home and that he violated their trust. Additionally, the court recalled that the appellant gave a statement to the police about "how horrified he [was] every time . . . the suggestion was made that he had sex with his own relative. He himself expressed the notion of how morally repugnant that is repeatedly and – and used that – that indignation as . . . a way to defend himself against the accusation."

The court further noted that the sexual activity took place repeatedly over a span of three or four months. The court said, "This is not a crime of impulse, of a momentary loss of control. This was a course of conduct entered into gradually and pursued and repeated for months." The court also observed that "there were several different sexual acts. They were in some cases at least moderately violent where he just literally pushed her down, put something over her face, and got on top of her and – and raped her." The court further noted that the appellant threatened to harm the victim and her family if she revealed that he had molested her. In her victim impact statement, the victim said that she was frightened by the threats and that she was embarrassed by the violation. The court found that the appellant "robbed [the victim] of her childhood." The court observed that the victim's pregnancy imposed upon her "[m]ore responsibility than a child her age should ever be require[d] to shoulder . . . and this is going to be a permanent characteristic of her life." The court also was bothered by the evaluation team's opinion that the appellant did not accept responsibility for his actions. After considering the foregoing, the trial court ordered that two of the

twenty-five-year sentences be served consecutively for a total effective sentence of fifty years.  See State v. Marcos Enrique Collazo, Sr., No. M2009-02319-CCA-R3-CD, 2011 WL 4529643, at *20 (Tenn. Crim. App. at Nashville, Sept. 29, 2011).  We conclude that the trial court did not err by imposing consecutive sentencing.

### III.  Conclusion

In sum, we conclude that the trial court did not err in the admission of evidence; that the evidence was sufficient to sustain the appellant's convictions, and that the trial court did not err in sentencing the appellant.  Accordingly, the judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE